# PALMA v. STATE FARM FIRE & CASUALTY CO.
## Case No. 83-4113 CA(L) 01 E
### Fifteenth Judicial Circuit, Palm Beach County
### August 15, 1984

### APPEARANCES OF COUNSEL

**Ronald V. Alvarez** for plaintiff.
**Stephen C. McAliley** for defendant.

### OPINION OF THE COURT

W. C. WILLIAMS, III, Circuit Judge.

### OPINION: FINDING OF FACTS: FINAL JUDGMENT

Margarita J. Palma filed an amended complaint in the circuit court seeking payment for unspecified medical and other expenses under her PIP coverage with State Farm Fire and Casualty Company. The only

item in dispute was a bill for a thermogram sent to the plaintiff Palma by Thermographic Medical Associates, Inc., a corporation directed by one Harry Rein, J.D., M.D. By the time it became known that the claim involved only $600.00 this Court had jurisdiction as a result of a counterclaim (later an amended counterclaim) for declaratory relief filed by State Farm against Margarita J. Palma.

The action for declaratory relief asked the Court to declare that thermographic examinations in musculoskeletal injuries and nerve root impingement were not necessary medical treatment as defined under Florida Statute 627.736 (Personal Injury Protection) and, therefore, were not reimbursable to the plaintiff, or any plaintiff, under her PIP coverage in the insurance policy issued by State Farm. The policy language tracked F.S. 627.736.

State Farm also asked the Court to declare that its refusal to pay for thermograms and claims involving musculoskeletal injuries or nerve root impingement did not constitute an unfair business practice under F.S. 624.155, commonly known as the Civil Remedies Act.

The parties agreed to waive jury trial and this case proceeded to trial before the Court.

## ISSUES INVOLVED IN THIS CASE

By the time of trial the issues involved in the case had become clearly defined.

On the main claim of the plaintiff the issues were:

1. Whether or not the thermographic examination (a diagnostic study) performed under the plaintiff was a necessary medical service.

2. Whether or not the cost of the thermographic examination was reasonable.

The issues presented by State Farm in its action for declaratory relief were as follows:

1. Whether or not thermographic examinations in the case of musculoskeletal injuries and nerve root impingement constitute a "necessary medical service" within the meaning of F.S. 627.736 (1)(a).

2. Whether or not failure to pay for such examinations constitutes an unfair business practice under F.S. 624.155. It therefore clearly follows that if the Court finds that thermographic examinations of this nature are not a necessary medical treatment, then failure to pay for the examinations is not an unfair business practice (although the

opposite is not necessarily true because of the provisions of F.S. 624.155).

All parties concede that a necessary medical service would include not only necessary medical treatment *but a necessary diagnostic test.* Consequently, the primary issue further resolves itself into whether or not a thermogram, used in connection with a musculoskeletal injury or suspected nerve root impingement, constitutes a medically necessary diagnostic study.

Resolution of these issues involves another problem:

3. How does the Court determine whether or not a given medical procedure is a medically necessary diagnostic study?

The phrase "necessary medical service" lacks definition in F.S. 627.736(1).

The phrase "medically necessary" is used also in the Workers Compensation Act. There the phrase "medically necessary" *is* defined in 440.13(c). This was not always the case; the need for definition was recognized and the definition was added by amendment in 1983. Although the statute is not binding for interpretation of "medically necessary" in this case, it is, nonetheless, helpful in *pari materia* interpretation of the same phrase in other statutes or regulations.

The Court is therefore asked, and finds it necessary, to set some broad standard as to what type of diagnostic treatments qualify as "medically necessary" under F.S. 627.736 in order to determine factually whether the use of thermography in musculoskeletal and nerve root impingement constitutes a necessary medical diagnostic procedure as contemplated by F.S. 627.736.

## ULTIMATE FINDINGS

On the main claim by Margarita J. Palma the Court finds the thermographic studies performed in her case did not constitute a medically necessary diagnostic study and therefore was not a necessary medical service in the meaning of F.S. 627.736(1). As a result of this finding, the Court does not reach the issue as to whether the charge was reasonable, if, indeed, any charge can be reasonable in the circumstances.

It is therefore ORDERED AND ADJUDGED that in the main claim on behalf of Margarita J. Palma that judgment be entered in favor of the defendant State Farm Fire and Casualty Company, a foreign corporation, and against the plaintiff Margarita J. Palma, the plaintiff to take nothing from her suit and the defendant to go hence without delay.

82

The reasons for this final judgment will be explained in the remainder of this Opinion concerning the counterclaim for declaratory relief by State Farm Fire and Casualty Company.

## ENTITLEMENT TO DECLARATORY RELIEF

There are countless Florida cases dealing with the scope of declaratory relief and there is no question in the mind of this Court that it is severely abused. Some decisions seem more restrictive than other decisions, but under the facts of this case, the relief sought is highly appropriate. The basic philosophy behind actions for declaratory judgment seems well expressed in *Platt v. General Development Corporation*, 122 So.2d 48 (Fla. 2d DCA 1960). There the court cited earlier decisions which held:

> . . . it should be clearly made to appear that there is a bona fide, actual, present, practical need for the declaration; that the declaration should deal with the present, ascertained or ascertainable state of facts or present controversy as to a state of facts; that some immunity, power, privilege or right of the complaining party is dependent upon the facts or the law applicable to the facts; that there is some person or persons who have, or reasonably may have an actual, present, adverse and antagonistic interest in the subject matter, either in law or fact, that the antagonistic or adverse interest (sic) are all before the court by proper process of class representation and that the relief sought is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity.

These requirements are not inflexible. See *John F. Kennedy Memorial Hospital v. Bludworth*, 432 So.2d 61 (Fla. 4th DCA 1983).

There can be no doubt as to the existence of a bona fide, present, practical need for a declaration on whether thermography is a necessary medical diagnostic study under the PIP Statute, F.S. 627.736(1). Thermography for musculoskeletal injuries and suspected nerve root impingement is mushrooming *as a business* in the State of Florida and, indeed, nationally, usually in the form of thermography clinics. Unlike other medical diagnostic studies, it is widely advertised in periodicals read by the legal profession and by direct mail to lawyers.

The admissibility of thermograms into evidence is, unfortunately, not before the Court in this case. It is this Court's opinion, however, that there are hucksters, charlatans, and "bootstrappers" who are members of questionable cliques within the American Thermography Association who are attempting to use thermography to increase the value of jury verdicts, rather than attempting to advance its efficacy as a diagnostic tool.

83

*The National Law Journal*, Vol. 5, No. 3, states as a headline "Thermography Raises the Stakes in Whiplash, Back Cases—PICTURES OF PAIN PAY OFF." Advertising handouts for pain clinics quote Margaret Abernathy, President of the American Academy of Thermology, as proclaiming: "Now we have something to show those twelve people in the jury box."

A folder widely distributed by the thermographer who interpreted the thermograms in this case, Dr. Harry Rein of Thermographic Medical Association, Inc., shows a colorful thermogram on its front cover with the statement, "Have you ever seen proof of pain?"

The inside back cover of the *Florida Bar Journal* has, for a long time, contained a full-page ad showing two thermograms with a caption "A Picture is Worth 1,000 Words" and a long dissertation making claims for thermography, many of which this Court finds from the evidence to be untrue. (The issue of the *Florida Bar Journal* in evidence is that of March, 1984. This same advertisement has appeared for many, many months. The Court notes that this particular advertisement has been removed from the June 1984 issue.)

Thermographic Medical Associates, Inc., a Florida corporation, offers *franchises* of thermography clinics. The franchisor, Dr. Harry Rein, receives a percentage of the gross profits after advertising. Dr. Rein described the franchising arrangements as similar to that of Burger King or Wendy's.

The testimony during this trial revealed that thermography clinics are obviously profitable. Thermography equipment costs approximately $40,000.00 and neither a physician nor a trained operator is necessary to operate the equipment. The cost of a CAT scan machine is well over $1,000,000 and a specially trained technician is necessary.

Dr. Joseph Uricchio, a respected orthopedic surgeon in Orlando and a witness for thermography, has taken 1,117 thermograms in the last year and a half at a charge ranging from $350.00 to $600.00 each. The charge for a CAT scan in Orlando is $175.00.

Although Dr. Edeiken was a founder of the American Academy of Thermology he testified against the diagnostic value of thermography. Dr. Edeiken is also Chairman of the Department of Radiology at Thomas Jefferson University in Philadelphia and it came to his attention that a group of orthopedic surgeons *on the staff at his medical school* had opened a thermography clinic. Dr. Edeiken personally investigated the clinic. He found that the patient charge was $400.00, regardless of which area of the body was involved or how many thermograms were taken. The clinic took thermograms of twenty

84

persons a day at the rate of $400.00 each for a gross of $40,000.00 per week. At the insistence of Dr. Edeiken the clinic was immediately closed.

In the instant case Linda Gries, PIP Supervisor of the West Palm Beach Branch office of State Farm, testified that at the time this action for declaratory relief was filed her office was receiving eight to ten bills for thermography per week, the amounts of the bills ranging from $300.00 to $750.00. Most bills represented thermograms of the back and the neck, and the typical charge was $600.00 This means that this single claim office for State Farm was receiving thermographic bills at a rate in excess of $5,000.00 per week. There are twenty-two claims offices in the State of Florida for State Farm alone.

From the facts presented in this case the Court is convinced to and beyond the exclusion of any reasonable doubt that the use of thermography has been abused throughout the State of Florida and the nation. This finding by this Court should not determine or obscure the issue of whether or not thermography at its present stage is a necessary diagnostic test under F.S. 627.736(1).

There can be no doubt that there is a bona fide, actual *and immediate* practical need for a judicial declaration dealing with this problem and for a definition of the term "necessary medical service" within the meaning of F.S. 627.736.

One other aspect of declaratory relief warrants comment. Courts need to be alert to the danger of rendering a declaratory judgment in a matter such as this without a thorough presentation to the court of all sides of the issue. No such problem existed in this case which involved six days of medical testimony on thermography by eleven medical witnesses from throughout the United States and Canada, most of national or international prominence.

The American Academy of Thermology (formerly the American Thermographic Society) is a group that represents the interests of thermographers in this country and Canada. (The terms thermography and thermology are identical.) Although Margarita Palma herself undoubtedly has little interest in thermology, the interests of thermographers were thoroughly and well represented. They were alerted to the existence of this declaratory judgment action by telegram sent by Harry Rein to Charles Wexler, Secretary/Treasurer of the American Academy of Thermology and a witness in this case, and to Dr. Margaret Abernathy, the President of the American Academy of Thermology. Dr. Wexler, in turn, contacted a number of other members of the American Academy of Thermology and furnished their

names to counsel for the plaintiff as witnesses or potential witnesses. In fact, all of the witnesses called by the counterdefendant in this case were members of the American Academy of Thermology and had first been contacted by Dr. Charles Wexler. They were asked to cooperate in opposition to the relief sought by State Farm.

State Farm presented the other side of the thermography controversy with equal energy and gusto. Testifying for the counterplaintiff were Dr. Leo Mahoney, a general surgeon, a pioneer in thermography and, even now, a prominent member of the American Academy of Thermology; Dr. Jack Edeiken, a full professor and Chief of Radiology at Thomas Jefferson Medical School in Philadelphia, Pennsylvania, and a founding member of the American Academy of Thermography; Dr. John McCullough, an orthopedic surgeon with very strong academic credentials, author of two textbooks and co-author of two papers on thermology presented at the 1983 meeting of the American Academy of Thermology; Dr. Charles J. Ash, a past president of the Missouri State Orthopedic Association who developed an independent interest in thermography and who has read most of the literature currently in print on the subject; as well as a local highly qualified neurologist, Dr. S. Russell Wilson.[1]

In this case there can be no doubt that the issues raised by the petition for declaratory relief were thoroughly presented and explored and that the interests of both thermographers and those asked to pay their bills were well represented.

## WHAT CONSTITUTES "NECESSARY MEDICAL TREATMENT?"

The PIP Statute provides for reimbursement of eighty percent of necessary medical services. This has been interpreted to include such diagnostic studies as a thermogram. The Court must determine whether a thermogram, *as used in musculoskeletal injuries and nerve root impingement,* is a reasonably necessary diagnostic study.

As mentioned, the insurance policy in question tracks F.S. 627.736. That Statute, the PIP Statute, contains no definition of "necessary

---

[1] Also scheduled to testify on behalf of STATE FARM was Dr. Michael Raskin, Department of Radiology at St. Francis Hospital, in Miami Beach, Florida. He was not called to testify but it would appear that Dr. Raskin, too, was an early proponent of thermography in the diagnosis of lumbar disc disease. His study is cited by Dr. Wexler in his book. According to Dr. Charles Ash, Dr. Raskin no longer believes thermography to be a useful diagnostic tool. This, of course, is hearsay and was not considered by the Court. However, there is no director for former, disillusioned thermographers and the Court feels that Dr. Raskin's name and whereabouts should be made known.

medical services." Because the Statute lacks any definition of what constitutes a necessary medical service, the argument of plaintiff/counterdefendant Margarita J. Palma was that this Court should find that a necessary medical service includes any diagnostic study that a physician chooses to perform upon a patient. And that this finding should be made regardless of the value of the diagnostic study, its acceptance in the medical community or the validity of its scientific basis. Under the plaintiff's view of F.S. 627.736 a necessary medical service is limited only by the imagination of the physician performing the service. Since the Statute contains no definition, the argument goes, anything deemed necessary by the treating physician is therefore necessary and must be paid. Any such interpretation is ridiculous and flies in the face of common sense and logic. The Court finds such reasoning unacceptable. The cost of medical care provided pursuant to F.S. 627.736 must ultimately be borne by the consuming public. Unnecessary medical treatment and unnecessary medical tests should not be encouraged. Although the definition of "necessary" when applied to a diagnostic study should not be unduly restrictive, neither should the term be meaningless. Some standards are absolutely necessary.

State Farm argues that even though the Workers Compensation Act is not involved in this case, it does contain a definition of "medically necessary" which is a fair and logical definition and, therefore, should be adopted by this Court in its interpretation of F.S. 627.736.

Florida Statute 440.13 provides that the term "medically necessary" as used in the Workers Compensation Act includes diagnostic studies which meet the following criteria:

1. It must be appropriate to the patient's diagnosis.

2. It must be consistent with the location of service and with the level of care provided.

3. It must be reasonably safe.

4. It should be widely accepted by the practicing peer group.

5. It should be based upon scientific criteria.

6. It should not be of an "experimental, investigative or research nature."

As stated earlier, the Court is not bound by the definition of "medically necessary" in 440.13; but, with equal certainty, the Court may look to that Statute for guidance. Statutes with a parallel scope, purpose and terminology should receive a like interpretation, particularly where the subject or object is so closely allied. 30 Fla. Jur.2d "Statutes" Section 13.

It has long been held that statutes may be considered in pari materia in a broad sense to the extent that the understanding of one statute may aid in the interpretation of another statute. When the Legislature uses a particular phraseology in dealing with a subject, the court may assume that in both statutes the Legislature intended exact words or exact phrases to mean the same thing. *Goldstein v. Acme Concrete Corp.*, 103 So.2d 202, (F.I.A. 1958).

The general purpose of F.S. 627.736(1) and F.S. 440.13 seems very similar since they both provide for the reimbursement of necessary medical services, both include diagnostic studies as well as treatment itself and both provide benefits regardless of fault.

The medical testimony in this case supports the last three criteria as to whether a given medical diagnostic procedure should be considered medically necessary.

Dr. Leo Mahoney, Directory of Thermographic Studies at St. Michael's Hospital, Toronto, Canada, and a member of the Royal Academy of Surgeons, testified that he felt all six criteria outlined in Chapter 400.13 constitutes an excellent scientific definition of "medically necessary".

Dr. John Alex McCullough, an orthopedic surgeon and, in the Court's view, a stern medical academe, was co-author of *the only semi-blinded study of thermography that exists in North America*. He testified that any scientific definition of a medically necessary diagnostic study should at least contain the last three of those elements. He testified that in order for any diagnostic test to be considered medically necessary and of diagnostic value it should be widely accepted by the practicing peer group, be based on scientific criteria and not be of an experimental or investigative nature.

Delving deeper, some definition is needed and required. The criteria are supported by much of the testimony and contradicted by none. The Court adopts these criteria in part and finds that a "medically necessary" diagnostic study or technique, as contemplated by F.S. 627.736(1)(a), must:

1. be widely accepted by the practicing peer group;

2. be based upon scientific criteria accepted by the majority of that peer group; and

3. not be of an experimental or investigative nature.

### CLAIMS FOR THERMOGRAPHY

Thermography measures only one physiological function, the surface

88

temperature of the skin.[2] Thermograms express photographically in patterns of color the differences in surface temperature of the skin. The controversy lies in whether these thermograms provide any useful information in the management of musculoskeletal injuries or nerve root impingement. The evidence in this case shows beyond clear and convincing evidence that they DO NOT.

In the field of musculoskeletal disease and nerve root impingement, some thermographers profess to find significance in asymmetrical patterns of color with nothing more required; some require a temperature change along the dermatome pattern of the nerve root affected; some find a "thermadome" pattern as distinct from the commonly recognized dermatome pattern (to account for the fact that asymmetries in skin temperature often do not follow traditional dermatome patterns); some require "25% asymmetry" in a thermogram (although "25% of what?" is never clearly answered); and almost all thermographers require at least a one degree centigrade difference in temperature to attach any significance to temperature differential, although this standard is not accepted for all parts of the body. There really seems to be no uniformity among thermographers as to what constitutes an abnormal thermogram. Therefore, there is no doubt in the mind of the Court, after hearing six days of medical testimony, that the beauty of a thermogram seems to lie in the eyes of the beholder and that its diagnostic value is not supported in any way by even one scientific study which conforms to scientifically accepted protocol.

## ACCEPTANCE BY THE PEER GROUP

The requirement that a medical diagnostic study be widely accepted by the practicing peer group is neither unreasonable nor illogical, especially in the area of medicine involved in this case. Obviously, members of the American Medical Association are far better qualified to judge the value of a medical diagnostic study than are members of the judiciary. A medical diagnostic technique, especially a non-invasive technique, which could quickly give significant information about the cause of undiagnosed neck or back pain would be a boon. It would, I'm sure, quickly gain wide acceptance among physicians treating musculoskeletal injuries and/or nerve root impingements. We all hope for the day when a physician, somewhat akin to Dr. "Bones" McCoy on Star Trek, passes an instrument no longer than a pack of king-sized cigarettes over our body and then tells what our ailment is.

The cause of chronic neck or back pain, sciatica, radiating pain,

---

[2] The polygraph, for comparison, measures breathing patterns, skin resistance to electricity, pulse rate, and blood rate pressure changes—four physiological responses.

musculoskeletal pain in general, is often difficult to diagnose and difficult to treat. The difficulty is generally enhanced by the fact that very many of these problems exist in some kind of medical-legal setting, whether it be litigation, compensation, social security, pension entitlement, or what have you.

As stated earlier, if thermography offered a way to more surely diagnose or rule out the organicity of such complaints, rapid and enthusiastic acceptance among the medical community dealing with such ailments would be overwhelming. Certainly widespread advertising would be as unnecessary as it is in myelography, CAT scans, EMG and other accepted diagnostic methods.

The Court finds that thermography is not widely accepted by the practicing peer group. The Court defines "practicing peer group" as being those physicians who commonly deal with the diagnosis and treatment of musculoskeletal disease and nerve root impingement.

The AMA DATTA Study of Thermography (Diagnostic and Therapeutic Technology Assessment) has pronounced thermography as not useful in the diagnosis of musculoskeletal disease or nerve root impingement. The American Academy of Thermology reacted promptly to this pronouncement by the AMA, both by persuasion and by threats of lawsuits, and the position paper was never widely distributed. Nevertheless it does exist. Certainly no report or pronouncement by the AMA supportive of thermology has been issued.

The American Thermographic Society renamed itself the American Academy of Thermology. In March of 1984 the members gave each other a one-day oral examination and those persons who took the examination were designated as "board certified." It appears to the Court that this board certification has little meaning, except among thermographers. An organization within the AMA known as the American Board of Medical Specialties concerns itself with the assessment and recognition of new specialties and subspecialties in medicine. The Court notes that thermology has not been recognized as a legitimate medical specialty by that organization. Dr. Charles Wexler explained this by testifying that for many years there has been a moratorium in effect whereby the American Board of Medical Specialties no longer recognizes new specialties or subspecialties in medicine. Dr. Jack Edeiken testified that no such moratorium exists. The evidence indicates that about ten years ago there was a brief moratorium, but that existed for a few months and no such barrier has existed since that time. Dr. Edeiken searched the records and found that neither the American Academy of Thermology, nor its predecessor organization

90

the American Thermographic Society, *had ever applied* to the American Board of Medical Specialties for recognition as a separate specialty or subspecialty in medicine.

An editorial in the October, 1983 (Vol. 70, No. 10) *Journal of the Florida Medical Association*, entitled "Thermography" states in part:

. . . this technique has been pounced upon by many individuals *at the periphery of medicine and there has been a great deal of suspicion that there is yet another questionable test which can be abused.* . . . while thermography has been accepted as evidence in some courts in the State of Florida, *it remains to be seen whether it will survive as a viable addition to the diagnostic armamentarium of practicing physicians.* (Emphasis supplied by the Court)

In any event, the Court finds that the use of thermography in the diagnosis of musculoskeletal diseases and nerve root impingement does not *anywhere in the nation* meet with general acceptance by those members of the medical community who treat such conditions. Its acceptance is limited to a small group of physicians who seem to be "bootstrapping" themselves and it is not as widespread as they would have you believe.

The Court cannot emphasize enough that it is not saying that thermography is useless. It should be clearly stated and stressed that this case involves the use of thermography in musculoskeletal disease and nerve root impingement. It does seem to offer more promise in the diagnosis of reflex sympathetic dystrophy which is a rather poorly understood condition, and it does seem to meet with acceptance in some uses unrelated to musculoskeletal disease, e.g. display of peripheral arterial insufficiency.[3]

## THE SCIENTIFIC BASIS OF THERMOGRAPHY

Thermography does have some valid scientific basis as it accurately measures the surface temperature of the skin. The doubts about its scientific validity arise when one attempts to relate an asymmetry on the surface of the skin to something like a protruded intervertebral disc at, say, the L-5-S-1 level of the spine in the low back.

Several theories have been advanced by thermographers to explain how it works. There is the "substance P" theory found in the book by Dr. Rein. It appears to be a recognized fact that a "substance P" is released into the bloodstream when a person experiences a sensation of significant pain. The theory postulates that this substance also irritates

---

[3] Deposition testimony of Dr. Sumio Uematsu.

91

the sympathetic nervous system causing ueriperial blood vessels to constrict, thereby altering the heat pattern on the surface of the body, as seen on the thermogram.

The "substance P" theory, and all other theories based on some temperature response to pain, seem to have been ruled out by a study entitled "Relation of Thermography to Back Pain". The study was done at the University of Toronto by Dr. Mahoney and Dr. McCullough. In the study seventy-one patients with mechanical back pain of at least two years' duration had an intervertebral facet injection with local anesthesia. Thermograms were performed immediately before and after the injection. Post-injection relief of pain and change in thermographic patterns were documented and analyzed. There was no significant correlation between pain relief and change in lumbar thermographic pattern. There was no significant correlation between pain relief and change in body temperature.

Dr. Sumio Uematsu is a highly respected proponent of thermography; however, he works primarily in the field of reflex sympathetic dystrophy and believes that thermographic changes are related to irritation of the sympathetic nerves.

A recent theory is that color changes on thermography are produced, in the case of a herniated intervertebral disc, by irritation of the sinuvertebral nerve. This theory is also unproven and does not explain why the entire dermatome of the affected nerve would now show up on the thermogram, rather than a small portion of it.

Someday temperature patterns on the surface of the skin may lead to significant diagnostic information, *but at the present time a valid scientific basis has yet to be found and proven.*

The absence of a proven scientific basis was expressed by one witness as follows:

They are trying to correlate a blotch of color to some specific linear dermatomal pattern. I have conflict with that . . . because they are not the same.

Elsewhere:

Thermography needs to have a better clinical basis, needs to have some clinical correlation with whatever the pathology is. Needs to have a better control group.

(It) needs to have some studies done that demonstrate . . . that indeed absence or irritation or a stretch of the sinuvertebral nerve does produce specific dermatomal patterns . . . I think that their physiology background to back up what they are saying is scant.

Another witness stated in regard to thermography:

It's superfluous for the care of the patient. It's ethereal. It's of no use, and the only use is medical-legal. That's what I'm saying, and I'm really saying that with the honesty and confidence that I'm right. You cannot use it for the management of a patient.

The last statement was made by Dr. Jack Edeiken, a founder of the American Thermographic Society, author of four textbooks and seventy published articles, and a radiologist of national repute. The lack of diagnostic efficacy in the use of thermography has caused him to drop his membership in the American Academy of Thermology. He is "A Fallen Angel" as far as the American Thermographic Society is concerned.

Although Dr. Edeiken's published experiments with thermography are still quoted by most thermographers (including Wexler's *Atlas of Thermography*), he is now an outspoken critic of the *use and abuse* of thermography in musculoskeletal disease. He nonetheless remains an active experimental thermographer seeking legitimate medical uses for it.

Based on the overwhelming clear and convincing weight of the evidence the Court finds that thermography lacks an adequate scientific basis as a diagnostic tool in the management of musculoskeletal disease and nerve root impingement *at this stage of its development*. The Court again emphasizes that all of the expert witnesses hope for the day that it will be a medically proven and accepted non-invasive diagnostic tool.

## THERMOGRAPHY: EXPERIMENTAL AND INVESTIGATIONAL

Articles in medical literature purport to find a high correlation in the detection of herniated intervertebral discs between thermography and myelography or thermography and CAT scanning or thermography and EMG's. The Court has learned through this case that the value of a scientific study cited to prove a given proposition can vary from worthless to nearly conclusive; therefore, an article in a medical journal needs to be critically read to determine the protocol of the study and whether or not it meets certain basic criteria common to any valid scientific inquiry.

Ideally an investigational study, including one designed to prove or disprove the efficacy of thermology as a diagnostic tool, should have the following characteristics:

1. *The study should have a control group.*

**93**

A control group is a group of "normals"—usually people without any symptoms. In thermography it is difficult to define an abnormal thermogram until you know what a normal thermogram looks like. A control group establishes normals. A control group tells you whether an apparent correlation between diagnostic study "x" and condition "z" has any meaning. In other words, if a diagnostic test is positive in ninety-four percent of patients with a given disease, but also is positive in ninety-four percent of the normal population, then the control group (the "normals") has shown the test to be of no diagnostic use.

2. *The study should be "blinded" or "partially blinded."*

A study should be blinded in an attempt to remove the bias of the investigator. A physician and/or a scientist who is conducting a study of a given diagnostic tool, or a given therapeutic treatment, usually hopes that the results of his study will show that it works. This can be a source of bias.

The most honest and dedicated scientific investigator can be influenced by advance knowledge about the patient and this is another source of bias. In the area of thermography, for example, it is not desirable that the physician interpreting the thermogram know in advance that the patient had a herniated intervertebral disc at, say, L-4-L-5. That knowledge might unconsciously bias his interpretation of the thermogram. If the study consists entirely of persons with known disc disease then the investigator might unconsciously make close calls in favor of an abnormality on a thermogram.

Often the investigator may lack the resources to make a study completely blinded, in which case it is desirable that he be at least "partially blinded". In such a case the investigator might know that the patient has disc disease, but is not told at what level in the spine the disc disease exists and he is not told the side where the lesion occurs. This is illustrated by the testimony of Dr. Edeiken who initially reported finding only about twelve percent normal thermograms in patients with herniated intervertebral disc disease. At the suggestion of a colleague, he mixed those thermograms in with thermograms of patients in whom intervertebral disease had been ruled out. Upon doing this, and again interpreting the same thermograms in the patients *with* proven disease, his error rate climbed to fifty percent. His initial results were probably unconsciously biased by his knowledge that the patient had proven intervertebral disc disease and when he "blinded" himself in the interpretation of thermograms, his results were so dramatically different as to ultimately cause him to recant his earlier enthusiasm for thermography as a diagnostic tool in lumbar disc disease. Dr. Edeiken

94

allowed his membership in the American Academy of Thermology to expire.

### 3. *The study should be prospective.*

A study should begin with one's next patient rather than a search through the records of the last one hundred patients. Here again, making a study prospective helps eliminate bias because anyone and everyone can see things differently in retrospect. In the field of thermography a study in which a thermogram is interpreted after it is known that a disc was proven at surgery or, contrariwise, that the pain disappeared without surgical intervention, can unconsciously affect the later interpretation of thermograms on such a patient.

These three basic characteristics of any scientific inquiry, including studies of the efficacy of diagnostic techniques, are the most important. Other desirable characteristics of scientific experiments include:

### 4. *Size.*

The number of patients should be large enough to produce statistically significant results.

### 5. *The study should have a statistically acceptable protocol.*

### 6. *The study should be multi-institutional.*

Although this is desirable, it is not always practical because of monetary considerations.

### 7. *The study should be independent.*

The physician/scientist directing a study should have no stake, financial, emotional or otherwise, in the outcome of the study. If a given study might contradict a researcher's previous written pronouncement on the subject investigated, this might also unconsciously bias the results.

### 8. *The ultimate test of any scientific study is its reproducability.*

If a study proves the efficacy of a diagnostic technique, then some other group of researchers using the same protocol should attain the same, or substantially similar, results. If a repeat study by another researcher at another institution produces markedly different results, then something is undoubtedly wrong. Reproductability is the keystone of any experiment in any field of science. Thermography has failed completely at this stage of investigation.

Certain studies are often cited by thermographers as supportive of the claim that thermography has diagnostic efficiency in lumbar disc disease comparable to myelography, CAT scanning or EMG. See, for

example, Pochaczevsky, Wexler, Meyers, Epstein and Marc, *Liquid Crystal Thermography of the Spine and extremities, its Value in the Diagnosis of Spinal Root Syndromes, J. Neurosurg.*, 56: 396-395 (March, 1981). All of the medical witnesses that testified in this case conceded that none of the existing studies (including the cited one) purporting to show such correlation between thermography and existing methods of diagnosing musculoskeletal disease and nerve root impingement, *were blinded, contained any control group or were prospective in nature.*

Because of these deficiencies Dr. Leo Mahoney teamed up with Dr. John McCullough to do the first semi-blinded, prospective study with a control group of the efficacy of thermography in diagnosing nerve root impingement. The particular study was entitled "Thermography as a Diagnostic Aid in Sciatica." Inasmuch as it is the only existing study which, in part, meets the primary scientific criteria of medical investigation, the study merits some description in this Opinion. The purpose of the study was:

> Thermography of the lumbar area and lower extremities has been reported to be of value in the diagnosis of sciatica due to intervertebral disc disease (citations). This present study was conducted to assess its value in a group of patients in whom a diagnosis of herniated intervertebral disc disease has been firmly established.

As can be seen, the study was not truly blinded because the diagnosis of herniated intervertebral disc disease had been established by other methods. However the thermographer (Dr. Mahoney) was blinded both as to the level and side of the lesion. Further, he was blinded to the control group. Dr. Mahoney did not know which patients were "normals" and which patients had firmly established intervertebral disc disease causing sciatica.

The results of the study were startling. In the control group twenty-five patients were completely healthy, without any pain or known disease of any kind. That is, they were normal people who felt good. In that control group seventy-five percent had abnormal thermograms. Dr. Mahoney stated, "If you don't have any normal, then where do you start? How can you judge an abnormal if you can't tell what is normal?"

In the cases where orthopedic surgeons had identified intervertebral disc disease, Dr. Mahoney was blinded as to the level and side of involvement. He was able to detect the correct side of involvement in only thirty-five percent of the patients with intervertebral disc disease by the use of thermography. He tried again by thermography of the

96

extremities. In those cases he was able to identify the correct side of involvement in only forty-eight percent of the cases. He explained the meaning of these results as follows, "So this really isn't quite as good as flipping a coin."

The study also produced an extremely high percentage of false positives (such as appeared in the control group when the study showed perfectly healthy people had abnormal thermograms) and a high percentage of false negatives (people who had proven intervertebral disc disease but had a normal thermogram). This paper, "Thermography as a Diagnostic Aid in Sciatica," and a separate study by the same authors entitled "Relation of Thermography to Back Pain" were presented to the 1983 meeting of the American Academy of Thermology.

## EFFORTS AT SUPPRESSION

The Court is of the opinion that the two studies done by Drs. Mahoney and McCullough have been deliberately suppressed by the American Academy of Thermology. The 1983 "Proceedings of the American Academy of Thermology," which contains these studies, have yet to reach publication because of unexplained printing difficulties. That might not be suspicious were it not for the fact that the "Proceedings of the American Academy of Thermology" which took place *June 2, 1984*, were promptly printed so as to be available for this trial on *June 25, 1984*.

The testimony of Dr. John A. McCullough speaks for itself:

And to date the only reigning blinded studies that are available to my community are the study we've done . . . and the study of Eon Goldy's done in Stockholm. These are the only two studies that I am aware of that are a truly blinded assessment of the clinical efficacy of thermography that follows a group of patients through the completion of treatment. And to compare thermography to myelography and CAT scanning is not an acceptable blinded study.

We made the unfortunate mistake of submitting these papers to the Thermographic Society, actually Dr. Mahoney presented them. At the time of presentation we signed a waiver saying that we would not publish these studies in any other journal except the one that the American Academy of Thermology was going to publish, and I had been trying to get from Dr. Abernathy a date as to publication. Because I am getting tremendous heat from my (medical) community to publish this work.

And I am blocked from publishing it because of an agreement that

**97**

we had with the American Academy of Thermology saying that we will not publish it because of their intent to publish.

Now, we have presented it to their meeting but I cannot get a firm date as to when they're going to publish it and I am about to say that I wish to withdraw my consent or agreement with them and publish this in one of the peer review journals.

Dr. Abernathy says that they're having a considerable amount of trouble getting the publication together because of the color format that they have to use.

Dr. Abernathy to me is a very responsible person and I have nothing but good thoughts about Dr. Abernathy and I have to believe what she says is true.

It's been presented to the International Society for the Study of the Lumbar Spine which is a very tough peer review society and it's not easy to get a paper on that Society without extensive peer review.

And I presented it and it was accepted by that Society and they are now saying to me that paper has to be published, so I'm between a rock and a difficult place. I know the paper has to be published, I want it to be published, yet it's in the hands, with an exclusive agreement, of an organization that can't quite seem to get it out.

This Court is not as charitable as Dr. McCullough since the 1984 proceedings were obviously rushed into print for the purpose of this trial. This Court is shocked and concerned at the obvious suppression of legitimate medical research and my shock and concern should be shared by every member of the medical community, academic or otherwise.

This Opinion is not a medical journal, but the basic text of these articles is attached as an Addendum to this Opinion. The Addendum omits the case studies and photographs. Making the study an Addendum will at least make the basic text of it available to the medical and legal community. After all, the study is in evidence in its entirety, so the Court has no compunction in publishing it. The other blinded study reaching the same conclusion by Eon Goldy of Stockholm, Sweden, apparently does not yet exist in an English translation.

## ADDITIONAL COMMENTS

There is no doubt that this case is the first case before a trial court in which both sides of the issue of thermography have been thoroughly explored by witnesses truly competent to do so. This Court is compelled to make some further comments about this controversy.

98

Unfortunately, the admissibility of thermograms into evidence was not an issue in this case. This Court itself permitted a thermogram to be admitted into evidence. See *Cleveland v. City of West Palm Beach*, Palm Beach County Circuit Court Case Number 82-6344. No objection to the exhibit was made in that case and the Court certainly did not have the benefit of the knowledge it now has after six days of medical testimony by highly qualified physicians. The Court is very aware of *Fay v.Mincey*, 9 FLW 1435, (2 DCA 1984). The *Fay* decision should be read carefully when addressing the issue of the admissibility of thermograms into evidence. The trial judge acknowledged the validity of thermography based on *uncontradicted* evidence given by the thermographer. As stated in *Fay*:

> In the case *Sub judice*, Dr. Rosenthal's *undisputed* testimony as to the acceptability and reliability of LCT (Liquid Crystal Thermography) for diagnosing the presence of soft tissue injuries supports the trial court's decision to acknowledge the validity of LCT for the purpose of aiding the jury in its deliberations. (Emphasis by this Court)

This is the usual situation when thermograms are offered into evidence. The claims made by the thermographer in *Fay* seem to have been particularly grandiose. *Fay* does make it clear that:

> In Florida the admissibility of evidence relating to a relatively new scientific-medical test, experiment or procedure, lies largely within the discretion of the trial court. *Rodriguez v. State*, 327 So.2d 903 (3rd DCA 1976).

A court may have no choice when faced with uncontradicted testimony. Consequently it seems that thermograms will be introduced into evidence to support injury claims of a plaintiff or to refute them. Each time this happens some court or some jury has been misled as to the scientific value of a thermogram and justice has been done a disservice. To paraphrase, "If they knew then what I know now."

No trial judge or court of appeals can be expected to conduct an independent investigation into the merits of a new and highly touted diagnostic test. The medical profession has the primary obligation to the courts and to society to call to public attention such matters as the misuse of thermography and false claims for its diagnostic efficacy. When, however, testimony of the caliber and nature of that elicited in this trial comes before the trier of fact, the Court is compelled to comment, even though admissibility is not an issue in this case. The Court has an obligation to share its views, albeit dicta, with its sister

**99**

courts. As far as this Court is concerned, thermograms are not admissible into evidence.

Some effort has been made by the Florida Medical Association (editorial, October 1983 issue) and the American Medical Association (DATTA Project) to alert other physicians, but no discernible effort has been made to alert the public. This Court feels that more should be done. Such huckstering of thermography for its use in the routine care of neck and back injuries discredits legitimate uses of thermography and discredits legitimate, on-going medical research. This situation constitutes almost a medical-legal scam and one which can be ended by the involvement of inquiring, legitimate physicians. The Court hopes that every physician dealing with musculoskeletal disease and nerve root impingement will concern himself or herself with the issue of thermography. This Court also hopes that some pronouncement will soon be forthcoming from the American Academy of Orthopedic Surgery and its counterparts in radiology, neurology, neurosurgery and other specialties dealing with musculoskeletal disease and nerve root impingement.

It is appropriate to note here that the American Academy of Thermology appears to be actively resisting, through pretended but delayed acquiescence, any further research on the efficacy of thermography in the diagnosis of neck and back injuries. Consider the efforts of Dr. McCullough:

> And at a meeting . . . called the Challenge of the Lumbar Spine, and this is where we go and challenge each other with new ideas. I challenged Charlie Wexler to collaborate with me in blinded study.

> He publicly accepted. I publicly announced the study, the protocol for that study was drawn up by Dr. John Frimore, who is a professor of orthopedics at the University of Vermont . . . he is an approved researcher for the F.D.A. . . . it was approved for an F.D.A. grant, it was submitted to Dr. Wexler and submitted by me twice and by Dr. Frimore once, and we have not even had the courtesy of a reply from Dr. Wexler.

> So, in the face of that, I have sought out other people to help me with the blinded study. And I have chased the thermography community as much as I possibly can to get them to help me do a blinded study.

At the time of his videotape testimony, Dr. McCullough thought he had the agreement of Dr. Joseph Uricchio, a witness for plaintiff Margarita J. Palma. However at trial, Dr. Uricchio attested that he was still awaiting final approval from the American Academy of

100

Thermology. This Court hopes, but seriously doubts, that such approval will be forthcoming any more quickly than publication of the 1983 Proceedings of the American Academy of Thermology.

Again, it cannot be overemphasized that this Court is very much aware there exists in the field of thermology not only legitimate medical research, but also ethical, responsible physicians who are seeking a solution to chronic pain in patients, reflex sympathetic dystrophy, and other medical problems through the use of thermography. This Opinion is nowise intended to reflect on respected medical researchers such as Dr. Sumio Uematsu or, indeed, on any member of the American Academy of Thermology who is using this tool in the hope of finding new answers. As noted earlier, two of the witnesses who testified on behalf of State Farm, Dr. Edeiken and Dr. Mahoney, are continuing active research in the field of thermology.

No purpose would be served for the Court to further outline the extensive testimony and documentary evidence considered in this case. *The overwhelming weight of the evidence is that thermography is still in an experimental and investigative stage.* Its usefulness in musculoskeletal disease and nerve root impingement has not been established in any scientifically acceptable study. The most acceptable study that does exist, the semi-blinded prospective study by Drs. Mahoney and McCullough which included a control group, suggests that thermography is of no diagnostic value in such disease.

The Court, therefore, finds thermography to be of unproven and dubious value in the diagnosis of musculoskeletal disease and nerve root impingement. It is clearly investigational. It lacks an established scientific basis. It has not been widely accepted by physicians dealing with such disease.

## DECLARATORY RELIEF GRANTED TO COUNTERPLAINTIFF

The counterplaintiff State Farm Fire & Casualty Company is granted declaratory relief as follows:

1. The Court finds that thermography, when used as a diagnostic tool in musculoskeletal disease and nerve root impingement, is not a necessary medical service within the meaning of Florida Statute 627.736(1) and bills for such diagnostic studies submitted to State Farm Fire & Casualty need not be paid by it.

2. The Court finds that it does not constitute an unfair claims practice, within the meaning of Florida Statute 624.255(1), for State Farm Fire & Casualty to refuse to pay thermography bills in such cases for the reasons that these diagnostic studies do not constitute a necessary medical service. See also Florida Statute 624.255(5).

The Court finds it inappropriate to tax costs against Margarita J. Palma. The finding that State Farm Fire & Casualty is entitled to declaratory relief it sought does not compel, in the Court's view, assessment of costs against Margarita J. Palma. Inasmuch as State Farm is the prevailing party, it is inappropriate to tax costs against State Farm; therefore no costs will be taxed.

# APPENDIX

THERMOGRAPHY AS A DIAGNOSTIC AID IN SCIATICA

Leo Mahoney, B.A., M.D., M.S., F.R.C.S. (C)*

John McCulloch, M.D., F.R.C.S.(C)**

Adele Csima, M.A. ++

* Associate Professor
 Department of General Surgery
 St. Michael's Hospital
 University of Toronto

** Associate Professor of Orthopedics
 Northeastern Ohio University
 College of Medicine
 Rootstown, Ohio

++ Associate Professor
 Department of Preventive Medicine
 and Biostatistics
 University of Toronto

ADDENDUM 1

## PURPOSE

Thermography of the lumbar area and lower extremities has been reported to be of value in the diagnosis of sciatica due to intervertebral disc disease (1) (s). This present study was conducted to assess its value in a group of patients in whom a diagnosis of herniated intervertebral disc disease has been firmly established.

## METHOD

### Thermography

All thermograms were performed in an air conditioned draft-free room with a constant ambient temperature of 20 degrees centigrade. The patients were undressed to expose their whole back and upper half of the buttocks (to the level of the greater trochanters) and both legs to the groin. They were allowed to cool for 20 minutes. An AGA Thermovision model 680 was used to obtain the thermograms. Black and white and color thermograms were taken of the posterior aspect of the thoraco-lumbar spine and of the anterior, posterior, and lateral aspects of both legs and feet. The thermograms were interpreted independently by one of us (LM) with no knowledge of the side of level of clinical involvement. Each change in color represents one degree C change in temperature. Any difference $\geq$ degree C between the two sides is considered significant.

Twnety five volunteers with no previous back complaints or history of treatment for back disorder had lumbar and lower extremity thermograms performed. Twenty three were women, two were men. The age distribution is outlined in Table I.

**104**

Twenty three patients with classic herniated nucleus pulposus were clinically documented by one of the authors (JM). Lumbar and lower extremity thermograms were performed in the same manner.

## CLINICAL DIAGNOSIS

The diagnosis of herniated intervertebral disc disease was firmly established. Patients were sequentially selected from a clinical practice to meet the following criteria:

a) The dominant complaint had to be sciatic discomfort rather than back pain.

b) Neurological symptoms and/or signs had to be present.

c) Straight-leg raising had to be significantly reduced.

d) Supporting investigation in the form of myelography or a CT scan had to be done.

In addition, the patients were all sent by other orthopedic or neurosurgical specialists with the diagnosis of HNP specifically for the purpose of chemonucleolysis. The patients all had symptoms for at least three months, all were considered acutely symptomatic, none had previous surgery or litigation claims, all had failed to respond to adequate conservative care and any degenerative changes on plane radiography were minimal. In summary, these patients were classic cases of HNP with as many variables as possible omitted.

The male/female ratio was 14:9. The average age was just below 40 years. The levels of involvement and clinical presentation are summarized in Table II.

Following thermography, the patients underwent chemonucleo-lysis without complications. Follow-up at least six months

**105**

post injection by telephone by an independent research assistant revealed a surprisingly high success rate following discolysis with chymopapain. Twenty two of twenty three patients had a successful outcome with the only failure at L-4,5 subsequently achieveing a successful result witn laminectomy/disectomy.

## Normal Volunteers

Perfectly symmetrical back thermograms were identified in only three normal patients (Fig. 1). Thirteen demonstrated an asymmetry of $\geq 1$ degree C which could well be considered to be significant of underlying muscle or disc disease (Fig. 2) (Table III).

Perfectly symmetrical leg thermograms were identified in only six normal patients (Fig. 3). Sixteen demonstrated an asymmetry of $\geq 1$ degree C which could well be considered to be evidence of involved dermatomes in herniated intervertebral disc disease (Fig. 4, 5). Twelve of those were due to superficial varicose veins (Fig. 6) (Table IV).

## Patients With Herniated Intervertebral Disc

Twenty-three patients with proven herniated intervertebral discs were examined (Table V). All the lumbar thermograms were technically satisfactory. Eight were normal (Fig. 7). Of the 15 classified as abnormal, the findings were on the wrong side in six.

In the diagnosis of the side of involvement of herniated intervertebral disc disease, lumbar thermography had a sensitivity of 35 percent (18/23) and a specificity of 70 percent (16/23).

All the extremity thermograms were technicall satisfactory.

**106**

Eleven identified the correct side of involvement and in all
of them the thermographic pattern was considered to be consistent
with the dermatome involved clinically (Fig. 8). Eight were
normal (these were not the same patients as those with normal
back thermograms). Four identified the wrong side of involvement.
In the diagnosis of the side of involvement of herniated intervertebral
disc disease, leg thermography had a sensitivity of 48 percent
(11/23) and a specificity of 83 percent (19/23).

## DISCUSSION

The recommended use of thermography as a diagnostic
tool in lumbar disc disease is based on the assumption that in
normal individuals there should be no significant temperature
difference between the extremities or between the two sides of
the lumbar area lateral to the midline. It is also assumed that
lesions affecting the lumbar musculature usually manifest themselves
by increased vascular heat emission and that in herniated intervertebral
disc disease of some months duration the sympathetic overactivity
leads to decreased vascular heat emission along the course of
the motor nerve route (1), (2), (3). We found no evidence to
confirm any of these assumptions.

Very few of our normal patients had perfectly symmpetrical
thermograms. We have assumed that a temperature difference must
by $\geq$1 degree C to be considered significant of disease. On this
basis, over 50 percent (13/25) had significantly abnormal back
thermograms and 64 percent (16/25) had significantly abnormal
leg thermograms although a surprisingly high number (12/25) of
these normal people had superficial varicosities which caused
the asymmetry. In detecting the side of involvement in patients
with proven herniated intervertebral disc disease, lumbar thermography
had a sensitivity of only 35 percent, leg thermography a sensitivity
of only 48 percent.

**107**

Many "normal" individuals with no back complaints do not have symmetrical back and leg thermograms. Asymmetry in such thermograms cannot be assumed to be evidence of herniated intervertebral disc disease.

In patients with confirmed herniated intervertebral disc disease, the sensitivity of both lumbar and leg thermography in identifying the side of involvement was so low that we consider thermography to be of no diagnostic value in this disease.

108

## REFERENCES

1. Edeiken, J., "Thermography and Herniated Lumbar Discs",
 Am. Journ. Roentgenol. Radium Ther. Nucl. Med., Vol.
 102, 1968, p. 790.

2. Ching. C., Wexler, C.E., "Peripheral Thermographic
 Manifestations of Lumbar Disc Disease", Applied Radiology,
 September-October, 1978.

3. Raskin, M.M., Martinez-Lopez, M., And Sheldon, J > J > <
 "Lumbar Thermography in Discogenic Disease", Radiology,
 Vol. 119, 1976, pp. 149-152.

109

TABLE I

Normals

Age

| ≤ 20 years | 9 |
|---|---|
| 21-40 | 10 |
| 41-60 | 6 |
| | 25 |

---

TABLE II

| Root Involved | Total Pts. | Leg Pain Dom. | Neuro. Symptms | SLR Changes | Neuro. Signs | Positive Invest. |
|---|---|---|---|---|---|---|
| Lumbar 4 | 2 | 2 | 1 | 2 | 2 | 2 |
| Lumbar 5 | 6 | 6 | 4 | 6 | 5 | 6 |
| Sacral 1 | 15 | 15 | 7 | 13 | 14 | 15 |

---

TABLE III

Normal Patients Back Thermograms

| SYMMETRICAL | 3 |
|---|---|
| ASYMMETRICAL (<1.0 degrees C) | 8 |
| SYMMETRICAL (>1.0 degrees C) | 13 |
| | 25 |

---

TABLE IV

Normal Patients Leg Thermograms

| SYMMETRICAL | 6 | |
|---|---|---|
| ASYMMETRICAL (<1.0 degrees C) | 3 | |
| ASYMMETRICAL (>1.0 degrees C) | 12 | (superficial varicosities) |
| ASYMMETRICAL (>1.0 degrees C) | 4 | |
| | 25 | |

110

RELATION OF THERMOGRAPHY TO BACK PAIN

Leo Mahoney, B.A., M.D., M.S., F.R.C.S.,(C)*

Norman Patt, B.A., M.D., D.M.R.(D), F.R.C.P.(C)**

John McCulloch, M.D., F.R.C.S.(C)***

Adele Csima, ++

* Associate Professor
 Department of General Surgery
 St. Michael's Hospital
 University of Toronto.

** Associate Professor
 Department of Radiology
 St. Michael's Hospital
 University of Toronto.

*** Associate Professor
 Orthopedic Surgery
 Northeastern Ohio Universities
 College of Medicine
 Akron, Ohio

++ Associate Professor
 Department of Preventive Medicine
 and Biostatistics
 University of Toronto

ADDENDUM II

111

## RELATION OF THERMOGRAPHY TO BACK PAIN

### INTRODUCTION

Thermographic patterns in the lumbar area have been reported to change with relief of pain (1). The purpose of this study was to determine if abnormal thermographic changes were present in patients with low back pain of mechanical origin of long duration and if these changes disappeared when the pain was relieved by injection of local anesthesia.

### METHOD

71 Patients with mechanical back pain of at least one year's duration were selected as candidates for intervertebral facet injection with local anesthetic.

These patients had all had long-standing mechanical backache. They did not have any evidence of significant root tension, irritation, or compression as manifested by a significant amount of leg pain, reduced straight-leg raising or neurological symptoms and signs. These patients were all dominant back pain with little in the way of leg symptoms or signs.

Through usual investigative measures, disease processes other than degenerative disc disease or facet joint disease were ruled out.

Most of the patients in this series were not involved in compensation or motor vehicle accident claims and no patients had had previous surgical intervention.

### CLINICAL DIAGNOSIS

Pain -- longstanding; failed to respond to fusion; disc excision, etc.

### FACET JOINT BLOCK

All 71 patients had intervertebral facet joint denervation with local anesthetic as follows:

Under fluoroscopic control the patient was positioned in the prone oblique position such that the superior articular

**112**

process of L4 was clearly visible. Position might then be modified to best reveal the superior articular process of L5 and of the sacrum and subsequently of L3. Local anesthetic was infiltrated into the overlying skin and down to the superior articular process. Thus, while the infiltrating needle probed the region, a familiar pain pattern was often produced. Then approximately 2 ccs. of short-acting local anesthetic (Xylocaine) and 2 ccs. of a longer-acting local anesthetic (Marcaine) was infiltrated into the region of the superior articular process, thereby intercepting the nerve on its course to the facet joint.

If the patient had unilateral pain only, then the procedure was performed on only that side. Three levels were tested and injected for most patietns. Occasionally if the most superior level achieved a familiar pain response then, considering the overlap in innervation, the procedure would be extended to include one more level.

The patient was then asked again about his symtoms, was observed as upright back movement maneuvers were tested and was immediately returned to the thermography department for post-injection thermograms.

### THERMOGRAPHY

Thermograms were performed immediately before and within one hour after the facet joint block.

All thermograms were performed in an air-conditioned draft-free room with a constant ambient temperature of 20 degrees centigrade. The patients were undressed to expose their whole back and upper half of the buttocks (to the level of the greater trochangers) and allowed to cool for 20 minutes. Colour and black and white thermograms were taken with an AGA Thermovision Model 680 using Polaroid film. Upon completion of satisfactory thermograms, the patients immediately went to the department of Radiology for their injection. Immediately after the injection, thermograms were obtained. The amount of pain relief was recorded. The thermograms were interpreted independently by one of us (LM) with no knowledge of the side of involvement. An asymmetrical focus of heat with a temperature difference of 1 degree C was considered to be significant.

### RESULTS

71 Patients (45 male, 26 female) were examined. (All

**113**

complained of pain at the time of their pre-injection thermogram. 61 (86%) had an abnormal lumbar thermographic pattern.) Following injection only one thermgram reverted to a normal pattern.

47 Patients (66%) had relief of pain following injectipn; 27 patients demonstrated a significant change in body temperature with an increase or decrease of 1 degree C (Table 1).

There was no significant correlation between pain relief and change in thermographic pattern nor between pain relief and change in body temperature. There was no significant difference between the response of male and female patients.

## DISCUSSION

Asymmetrical increased heat emission over the lumbo-sacral area in patients with back pain has been assumed to be due to increased vascularity of the underlying muscle which is in spasm (2). It has also been assumed that if no thermal asymmetry exists no disease can be present (3). Eight of our patients with pain due to demonstrable disease had normal thermograms (Fig. 1). The remainder were markedly abnormal (Fig. 2). Only one of these abnormal thermgrams reverted to normal with relief of pain following injection.

17 Patients demonstrated an increase in body temperature 1 degree C following injection of local anesthetic and 10 demonstrated a decrease of 1 degree C (Fig. 2). Although the demonstrated change in body temperature was not significantly correlated to the relief of pain, it is an interesting hitherto unreported finding following injection of local anesthetic in the lumbar area. It is not due to technical error. The thermograms were repeated one to two hours after the injection by the same technician under the identical controlled conditions. It does not conform to published reports of diurnal variation in thermal emission (4,5).

## CONCLUSION

Thermographic patterns of the lumbar-sacral area are not significantly affected by the relief of pain.

## REFERENCES

(1) Ching, C., Wexler, C.E., "Peripheral Thermographic
 Manifestations of Lumbar-Disc Disease", Applied Radiology
 September-October, 1978.

(2) Edeiken, J., "Thermography and Herniated Lumbar Discs",
 Am. Jour. Roentgenol, Radium Ther. Nucl. Med., Vol. 102,
 1968, p. 790.

(3) Raskin, M.M., Martinez-Lopez, M., and Sheldon, J.J.,
 "Lumbar Thermography in Discogenic Disease", Radiology
 Vol. 119, 1976, pp. 149-152.

(4) Matyukhin, V., Nedbaeva, N., "Human Physiology", Vol. 4,
 July-August, 1978, pp. 742-747.

(5) Marotte, H., Timbal, J., "Circadian Rhythm of Temperature
 in Man. Comparative Study with Two Experiment Protocols",
 Chronobiologia 8, 1981, pp. 87-100.